TATEL, Circuit Judge,
concurring in part, concurring in the judgment in part, and dissenting in part:
Given the court’s blanket characterization of the Tribe’s first three claims for relief, see Maj. Op. at 330-31, a little clarification is in order. The Tribe’s first claim alleges that the boundaries of the Great Sioux Reservation remain intact despite the 1890 presidential proclamation to the contrary, and it seeks a declaration to this effect. Second Am. Compl. ¶¶ 51-56. Its second claim alleges that certain transfers of land under Title VI of the Water Resources Development Act (WRDA), Pub.L. No. 106-53, §§ 601-09, 113 Stat. 269, 385-97 (1999), as amended by Pub.L. No. 106-541, § 540, 114 Stat. 2572, 2664-71 (2000), violate the Tribe’s 1868 Fort Laramie Treaty right to consent to any “cession” of land within the Great Sioux Reservation, see Treaty with the Sioux Indians, art. XII, Apr. 29, 1868, 15 Stat. 635. Second Am. Compl. ¶¶ 57-62. The third claim alleges that the WRDA transfers violate the government’s separate “trust responsibility” to consult with the Tribe before taking any “significant actions” related to its aboriginal land. Id. ¶¶ 63-67.
On appeal the Tribe effectively abandons the first of these as an independent claim for relief. See Appellant’s Reply Br. 20 (“[T]he Tribe is not seeking to obtain judicial review of, or otherwise to challenge, the 1890 proclamation under the APA. [T]he Tribe is seeking ... the determination of a question of law that must necessarily be determined in order to adjudicate its Second Claim for Relief.”); see also id. at 12 (arguing that the Tribe has standing to sue only for “any and all re *335 cently inflicted wrongs and injuries”); id. at 16. Given that, we needn’t address the claim at all.
As to the Tribe’s second claim, the 1889 Act, the 1890 proclamation, and the resulting alienation of lands within the Great Sioux Reservation are no doubt historical facts. See Maj. Op. at 332-33. But unlike the case the court cites for the proposition that the Tribe “cannot obtain review of a historical land claim otherwise barred by the [Indian Claims Commission] Act by challenging present-day actions involving the land,” id. at 7, the second claim focuses on the unlawfulness of the current WRDA transfers, not on the government’s continuing failure to remedy a historical wrong. Cf. Catawba Indian Tribe of S.C. v. United States, 24 Cl.Ct. 24, 29-30 (1991) (post-1946 claims barred where they allege only government’s ongoing failure to remedy an 1840 cession of reservation land). Rather than rely on the at best questionable effect of the Indian Claims Commission Act, I would affirm the second claim’s dismissal for a more basic reason— that the Tribe lacks standing to pursue it. The Tribe insists that the 1868 Fort Laramie Treaty entitles it to approve the WRDA transfers and claims that the government has deprived it of this right by transferring the lands unilaterally. But this claim is so transparently “frivolous” that we needn’t assume its merit for purposes of evaluating standing. See La. Energy & Power Auth. v. FERC, 141 F.3d 364, 368 & n. 6 (D.C.Cir.1998) (claim’s merits are assumed when evaluating standing unless “entirely frivolous”); see also Info. Handling Servs., Inc. v. Def. Automated Printing Servs., 338 F.3d 1024, 1030 (D.C.Cir.2003) (only “non-frivolous contention[s] regarding the meaning of a statute must be taken as correct for purposes of standing”). The WRDA itself makes abundantly clear that these transfers have no effect on existing reservation boundaries. See Pub.L. No. 106-53, § 607(a)(4), 113 Stat. 269, 395 (“Nothing in this title diminishes or affects ... any external boundary of an Indian reservation of an Indian Tribe.”). Thus, to the extent the lands at issue are reservation lands, they will remain so even after transfer. As a result, no WRDA transfer, unilateral or otherwise, even implicates—let alone harms—the treaty right to approve “cessions” of reservation land.
As to the Tribe’s third claim, the court sweeps it out with the first two, describing it as “based on the assertion” that these lands are still “part of the Great Sioux Reservation” despite the 1889 Act and the 1890 proclamation to the contrary. Maj. Op. at 330. And because the Indian Claims Commission could have adjudicated the effect of the 1890 proclamation on the reservation boundaries in 1946, the court concludes, the claim amounts to nothing more than a “historical land claim” that the Tribe may not litigate now, id. at 7. I disagree.
In reality the third claim rests not on the contention that the lands are within the Great Sioux Reservation—indeed, the claim concerns many areas that never were, see Second Am. Compl. ¶ 40 (alleging that 33 of the 51 lands at issue are outside the Great Sioux Reservation)—but rather on the assertion that the lands are “within Oglala aboriginal territory,” id. See Appellant’s Opening Br. at 45 (arguing that the Tribe has “aboriginal interests in the lands set aside by [the Fort Laramie Treaty of 1851] for [its] occupancy and use,” only “a portion of which ... eventually became the Great Sioux Reservation”). This, the Tribe quite plainly argues, imposes on the government a “trust responsibility” to consult with the Tribe before “taking any significant actions” as to the lands. Second Am. Compl. ¶¶ 63-67; Appellant’s Opening Br. 45-48; see also id. at 46 *336 (quoting the district court’s characterization of the third claim as asserting that the government “owe[s] the Tribe a trust responsibility based upon [its] aboriginal interest in the land at issue”). And because the majority of the lands at issue in the third claim were never part of the Great Sioux Reservation and thus were entirely unaffected by the 1889 Act and the 1890 proclamation, the claim clearly asserts a legal interest stemming from the Tribe’s aboriginal interests in the lands, rather than the “alleged nullity of the 1889 Act,” Maj. Op. at 332 n. 4.
Although the origins of such a duty (if such a duty exists) would certainly predate 1946, the alleged breach of the duty began in 2002 when the WRDA transfers began. Thus, because this claim could not possibly have existed in 1946—over half a century before the government began executing the WRDA transfers without consulting the Tribe—the Indian Claims Commission Act imposes no bar on its adjudication today.
Of course this conclusion raises the question of the Tribe’s standing to bring this claim, which the district court rejected and my colleagues have no occasion to address. See Maj. Op. at 332 n. 2. The district court ruled that because the Tribe possesses no “legally protected interest” in the land, it failed to allege any injury-in-fact. See Oglala Sioux Tribe v. U.S. Army Corps of Eng’rs, 537 F.Supp.2d 161, 169-72 (D.D.C.2008). But that reasoning improperly “decid[ed] the merits under the guise of determining the plaintiffs standing,” Info. Handling Servs., 338 F.3d at 1030. Unlike the Tribe’s second claim, and given the hornbook principle that the “federal government has a trust or special relationship with Indian tribes,” 1-5 Cohen’s Handbook of Federal Indian Law § 5.04[4][a], this claim is hardly so frivolous as to justify dispensing with the normal practice of assuming its merit for now. See Littlewolf v. Lujan, 877 F.2d 1058, 1063 (D.C.Cir.1989) (recognizing a general “guardian-ward relationship” between Indian tribes and the government, “deriv[ing] from the historical status of Indian tribes as ‘domestic dependent nations,’ and the correspondingly pervasive federal control over Indians as embodied in treaties and statutes” (quoting Cherokee Nation v. Georgia, 30 U.S. 1, 17, 5 Pet. 1, 8 L.Ed. 25 (1831))). To be sure, in light of the decades of private and government ownership of the Tribe’s aboriginal territory, as well as the legacy of the Tribe’s treaties with the United States, a Rule 12(b)(6) motion may get the better of this claim too. But at this stage of the litigation, the only question properly before us is whether the challenged conduct injures the Tribe’s claimed (and non-frivolous) legal interest in a direct, concrete, and particularized way that a court order would redress. See City of Waukesha v. EPA 320 F.3d 228, 233-35 (D.C.Cir.2003).
Thus assuming the third claim’s legal merit, I have no doubt the Tribe has standing to pursue it. The government’s failure to consult the Tribe before proceeding with the WRDA transfers deprived the Tribe of its alleged procedural right to be consulted, and such procedural injuries are redressable where, as here, “there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant,” Massachusetts v. EPA 549 U.S. 497, 518, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007). I would therefore reverse the dismissal of the third claim and remand to the district court for consideration of the merits.